Mark Ryan for the Idaho Conservation League, Your Honor. May it please the Court, I'd like to reserve four minutes of my time for rebuttal. The EPA's approval of the Idaho NPDES permit program was arbitrary and capricious in three ways. It approved of a mens rea standard that was stricter, greater than what EPA must comply with. It allowed for a statute of limitations period for civil violations that was unreasonably short. And it also allowed for an unauthorized state agency to oversee the feedlot industry in Idaho. These defects in the program are important because they undermine the minimum federal standards that are set out in the Clean Water Act and the EPA's implementing regulations that are designed to protect water quality in Idaho. And for these reasons, we ask the Court to remand the EPA's approval to the EPA without vacature and to give the State of Idaho two years to make the necessary statutory amendments to bring this into compliance and then resubmit the case to EPA for approval. I would like to then turn to each of the three issues in turn. First, the mens rea standard. The mens rea standard, I think, is a fairly challenging statutory construction question because the statute is so old, the regulation is so old. It was promulgated in 1984 before the amendment of the Clean Water Act in 1987. And that 1984 regulation was never updated. This is 40 CFR 12327B, which very clearly states that the burden of proof and the degree of knowledge of intent required under State law for establishing violations of paragraph 83 shall be no greater than the degree of knowledge of intent EPA must provide when it brings an action under the appropriate act. So this Court has held in U.S. v. HANASEC that that standard for EPA is simple negligence for misdemeanor violations of the Clean Water Act. That was a case brought by EPA. Yes, that's correct. And EPA agrees that that's its standard when it constructs. That's correct, Your Honor. Yes, yes. That did not involve Idaho or any other State. That's correct. And what 12327B says is that the State standard cannot be greater than EPA's standard. And EPA's standard is simple negligence. If that were the only provision, we wouldn't be here today, probably. That's correct, Your Honor. But let's talk about why we're here. Yes, but 83 in the note. Let me just ask one question on HANASEC. Yes. Is it your position or do you implicitly argue that before HANASEC that the EPA had to show a higher standard? I think HANASEC definitely set the standard as simple negligence. How about before? Before. I don't think we take a position on that, Your Honor. Arguably, they were required to take a higher standard before. I don't think courts had addressed that. And I don't know what EPA's position was before HANASEC. You take no – HANASEC just decided what the law was? HANASEC definitely interpreted Section 309C of the Clean Water Act after it was amended in 87, yes. In Section 309C in 1987, it was bifurcated prior to 87 amendments. It said willful or negligent. And then after 87, it became knowing. Knowing, negligent or knowing. Negligent or knowing for misdemeanors versus felonies. And that change in the statute was never reflected in EPA's regulations, which predate the 87 amendments. So as – That's actually the – why are we trying to kind of stick a square peg in a round hole here? I agree. So all of the briefing, both sides, is trying to take the A3, little two I's, and reconcile it with the B2, et cetera. Why are we trying to do that? Because that's what EPA relied on in the record. Well, but the – that – but does that make sense? I mean, so it seems to me that that's what the EPA said they – how they wanted to go about it. But then your argument is basically taking them at face value and saying, well, that's the argument to be made. If we look at our deference, if there's just a pure legal question of interpretation, is that something we're supposed to give our deference to? I would say in this case, no, Your Honor. If you read Kaiser v. Wilkie, where they clearly – the Supreme Court recently clearly cabined our deference quite a bit and made it clear that if the interpretation was not reasonable, you should not give deference to the agency. And I would – I think clearly this is not a reasonable interpretation of this regulation. This regulation really – if one buys their argument that the subsection A3ii note applies to a generic intent standard, it basically does away with B. B goes away. That minimum standard that EPA clearly was trying to set under the Clean Water Act with subsection B language is out of the – is gone. Before this Idaho situation, apparently there are 46 other states that had approval to do their own program. That's correct, Your Honor. And any of those other programs had the EPA ever required or mandated a higher standard or imposed a particular standard? Well, that's not in the record, Your Honor. But if you look outside the record, they're all over the map. There's no rhyme or reason to why what state has two years versus – or excuse me. No, not on the statute of limitations, on the mens rea. Excuse me, on the mens rea. They're all over the map on mens rea and on statute of limitations. But on mens rea, if you look outside the record. So in some states, some other states, they may – a state's program might only require – might require the higher standard. It's possible, yes. Again, it's outside the record. And I think what – Well, but it's a – I'm not sure if it's outside the record. I can always take a look at other statutes. Correct. Right? I'm just curious how – what was EPA's practice before Idaho? Did they have a – Well, I have looked at those other states, Your Honor. Nobody says anything. It's just like all of a sudden, Idaho comes along, boom, the lights go off. The lights go on and then they go off. Right. It's like all of a sudden, oh, this is really what it means. This is a problem that's been on the books for quite some time and has been largely ignored. EPA – if you look at EPA's approvals over those 46 prior states, they are literally all over the map. There's no rhyme or reason to one or the other. They have not consistently interpreted this all along. And what we're saying is they've been wrong since 1987. Mr. Ryan, you made two statements. I think the league's position is that we shouldn't even consider A3 little – the lies. Right? I think A3 little I was overturned in 87. Okay. They shouldn't even consider it. Well, certainly the note, yes. Okay. Just the note? It's hard to – it's possible to constrain A3 double I without the note, but I think A3 double I is probably gone as well. Okay. And you also said that if we interpret A3 little I the way EPA wants, that there is no A3 – No B. B2. That's correct. I don't know because B2 seems to deal with more than just A3 little – two little I's. It deals with the whole paragraph A3, which have other provisions. And why can't it be construed that B2 is a general proposition of the mens re standard from which is carved out a specific exception, the only exception being A3 little – two little I's? And why doesn't that give meaning to both of those provisions, which are in the document themselves, in the regulation? That language made perfect sense in 1984 when it was written, before the Clean Water Act was amended. And you're saying it made sense before because it came from willful to knowing? The standard at the time was a joint standard for both misdemeanors and felonies of willful and or negligence, one standard. That language is reflected here. So your position is before the amendment, it made sense that it was an exception? That's correct. Before the amendment, this language made sense. So my interpretation is the general B2 was accepted, or at least it was carved out an exception of A3 little – two or little – two I's, but that the amendment is the only thing that changed and that basically did away with the note. Is that what you're saying? Yes. The note was necessary because of the combined standard. But the note is still there. I'm sorry. But the note is still there. The note is still there, yes. That were the intent. EPA never amended this issue. Well, I don't think it means anything, the note is still there or not. The question is, does it have any legal significance? I would argue no. Because we could probably march through thousands of regulations that have become antiquated by additional statutory. So my question really is, Idaho has told the EPA that criminal negligence means gross negligence, something more than simple negligence. That's correct. And your position is that is at odds with the revised Clean Water Act language as interpreted by the federal courts, is that right? That's correct. If that's the case, then I understand the remedy you've asked is a remand to give Idaho, to give the EPA, to give time for Idaho to come into compliance? Yes. They would need to see statutory amendments since the state legislature. That's why we recommended a two-year time period. All right. Let me go back. How is A3 little to the lies now at odds with the amendment? The amendment broke civil and criminal, willful became knowing, and civil remained to be negligence without any further definition, right?  How is that at odds? I can see there's a slight difference between knowing and willful. That's correct. They both conjure up deliberateness. I just don't see how that does away and makes it at odds. If we ignore the note. You keep saying ignore the note, but that was at least prior to the amendment. Yes, that's correct. You concede that was in effect. So now tell me why the amendment puts that at odds. Because the amendment now, Congress, when it amended in 87, clearly said there shall be misdemeanor violations proven by negligence, which this Court has interpreted to be simple negligence, and then there are misdemeanors which would be knowing, excuse me, felonies which would be knowing. They separated the two out. They made it very clear what was unclear in the pre-'87 amendments. This is unclear here as to where you're supposed to go. Let me ask you about the note itself. So the note says states which provide the criminal remedies based on criminal negligence, gross negligence, or strict liability. Usually when you think of criminal negligence, you think of gross negligence. Do you think that criminal negligence there just means negligence? It's possible. I don't know what EPA was. This is a very confusing note. Your Honor, I've read this section a hundred times, and I still don't understand what it's trying to say. Because it has gross negligence, and as the Idaho Supreme Court acknowledges in Idaho, criminal negligence is gross negligence. But it seems like maybe what the EPA was trying to do here was to give the states several options about how to create their criminal statutes. I think you're correct. But in pre-'87, that's what they were trying to do. Nobody talks about strict negligence, so let's talk about that or strict liability. So a state could have a statute under the old note that says any violation of this section is a criminal violation because there's strict liability. Would that be okay? I believe so, yes. Okay. And that would also be legitimate under the new framing? Would a strict liability violation be legitimate under the new framing? I think that's actually stricter. That's actually more aggressive than what they have written now. So, yes, I believe it would. Well, it's hard because it's not greater than the crime. Yeah, it's not greater. It's not greater than. In other words, sorry, you're out of luck. If you do it, you're out of luck. It doesn't matter what your degree of culpability is. So why shouldn't this just be looked at as a way of giving the states an The states clearly. And the EPA has interpreted, even though it's got criminal negligence, well, really simple negligence can also be used. Gross negligence could be used. Clearly the act is set up to give the states some flexibility in setting up their programs. Section 402B, which is a section of the Clean Water Act, in which EPA reviews these programs, is clearly set up to give some flexibility. But it's also designed to have minimum floor, minimum standards, under which the states should not go. And that's what we're talking about here. What are these minimum standards? And our position is that this old regulation doesn't meet the current minimum standards of the Clean Water Act. I see. Just to let you know, you're ticking down on your time. I'd like to move on to statute of limitations, Your Honor. Statute of limitations, I think, is the two-year period is unreasonably short. Given the record, they propose two to five years on an inspection schedule and then up to two years to develop a case. Their statute of limitations is going to be gone on any violations they find during inspections and many of the cases that they bring. This is simply an unreasonably short period. It's not required to be five years, as the federal standard is, but the two-year period on the record we have before us is clearly quite short. In these prior other 46 states, what kinds of statute of limitations have they accepted? Same answer as before, Your Honor. All over the board. They're all over the board. And it's hard to make rhyme or reason out of why EPA is doing one or the other. Then why, with respect to Idaho, is it an abusive discretion to approve a plan that has two years? Because on the record before us, Your Honor, they say they're going to take two to five years for most of their inspections. They're going to inspect once every two to five years. And some of them is infrequently every ten years. A discovery kind of trigger? That's an issue that has not been resolved by the Idaho courts, or whether their statute of limitations is a discovery rule. There's language in there that suggests that they built in a discovery. I don't know. I have no idea what Idaho law is on discovery of an injury. And in our briefs, Your Honor, we discussed the Nancy Lee Mines interpretation of the discovery rule in Idaho, which seems to foreclose a discovery rule, which is also largely foreclosed in federal law as well. You suggest it should be five years? I think it depends on the record before us. Your five years, or the EPA's five years, is an occurrence. Excuse me? An occurrence. Yes. An occurrence. What the Idaho has, they have discovered, or should reasonably have discovered. I'm sorry, Your Honor. Discovered, or should have reasonably discovered the violation. Yeah, the standard in Idaho. There are two different starting points. Apples and oranges, it seems to me. In some circumstances, the discovery could be longer. The statute of limitations could be longer because there was no discovery or no reason to discover. Yeah, but if I'm a defendant in Idaho, and on 2010, I have a violation, and I'm inspected in 2014, and then it's two years later before they bring the enforcement act in 2016, the first argument I'm going to make is you're four years past the statute of limitations. You ought to have found this. If you had devoted more resources to your inspection program, you would have found this violation, and it was there for the world to see. You just didn't look. That's my first argument as a defendant in Idaho, if they bring that case against me. I'm going to be very successful. All right. I think we have your argument in mind. Thank you. I'll reserve the rest of my time. Thank you. Good morning, Your Honors. Patrick Jacoby from the U.S. Department of Justice. On behalf of the United States Environmental Protection Agency, with me at council's table is Courtney Weber from EPA's Region 10 office. Your Honors, rather than giving a formal intro, I'm going to jump in on a couple of the issues that you've raised. First, Judge Paez, you asked if where other states were on the criminal remedy and the heightened mens rea criminal penalty standard. In the state's brief, which is document, let's make sure I get the right number here for you, document ID number 11453255, document entry 42 in this case, on page 43 of footnote 6, there's a list from a survey of 30 other state program approvals dating back to the inception of the Clean Water Act, and it reveals that 15 states were approved with heightened criminal penalty standards that are higher than ordinary negligence. To answer that question first, and I think that does go, Your Honor, to the flexibility, and then you asked also about where other states were on the statute of limitations. On page 51 of our brief, which is document entry 37 in this case, we note in footnote 15 that there are a number of states that have shorter than a two-year statute of limitations. So I think looking to other states is useful and instructive, and I just wanted to fill in those blanks as we start. Turning back to- Why don't you start with the EPA's position on negligence. In reading the EPA's correspondence with Idaho and in conjunction with the federal case law, it appears that EPA's position is that negligence means simple negligence. Is that correct? Your Honor, there's no question and there's no debate in this case that when EPA is seeking to enforce the Clean Water Act for criminal negligence that the mens rea is simple or ordinary negligence. But EPA's position in its regulations, which have been on the books for quite some time, is that that's not necessarily the case when a state gets approval. And so if you look at- You know, this is where I feel like the EPA is not consistent because if you look at B-2, it says that the burden shouldn't be greater than the EPA has when it brings an enforcement action under Clean Water Act. And you've now told me that the EPA's burden for negligence, we'll leave knowing or willful aside, is simple negligence, correct? I think if I understand your question, yes, Your Honor. The EPA's burden is simple negligence, and I agree with you that the words in 127.23 B-2 say what they say. But if I may take it out just a little more broadly. So in this approval, EPA was tasked with trying to figure out what these two provisions mean side by side, A-3, small double I, and B-2. And so in order to give meaning to every word of the regulations, they had to look at which section is more specific, which section is more general. And so I think, if I may, just lay this out for how it's supposed to work in EPA's mind. This is how it starts. B-2 talks about establishing violations, and it addresses criminal and civil types of actions. It uses the phrase actions generally. It refers then to establishing violations, and then it goes immediately to under paragraph A-3. So right there you've got a specific reference out of B-2 saying there's going to be some more information coming in A-3 that could be more specific about how to establish these violations. And then if you come back to B-2 for a second, then it talks about not having a higher burden of proof or intent standard for the types of actions that EPA might seek. What that means in this reading that EPA has set forth in trying to reconcile A-3 and B-2 is that a state must have the same types of actions generally that EPA would be able to seek. For example, negligence. For example, they have to be able to bring civil cases. And so it's supposed to generally address those. It doesn't use the word negligence in B-2 like the way it does in A-3, which is more specific. It doesn't use the word willful. It doesn't have a note like the one in A-3, small double I. I hear your argument, but I just want to tell you my problem with the argument and then have you address it. But my problem is this. It's that when you're talking about a burden of proof, that is very clear and straightforward. It refers you back to the kind of violations that one might apply that to in A-3. But the statute changed, and when the language of the statute changed and the regulation was not changed to conform with the language of the statute, why is it we're trying to fit the two together at this late stage? Because it seems that in Idaho that you basically need gross negligence in order to have criminal negligence, not simple negligence. And that might have made sense under the old language, but those are not words that are even used in the current statute. So why are we trying to reconcile a note which has not been amended with a statute that has? And what's your support for that? Judge McEwen, I think this goes to Judge Piazza's question. The standard for negligence in Section 1319, that's 33 U.S.C. 1319, did not change between before the 1987 amendments and after. It doesn't say gross negligence in Section 1319. It didn't say it before. In fact, the only two changes to that provision that occurred in the 1987 amendments is two changes. One changes, as we discussed, as you discussed with the Petitioner, willful to known. Okay. And then instead of being one section, it split it off into two. Nothing about the language regarding negligence, nor even the penalties, changed in that 1987 Clean Water Act amendment. Nothing changed with regard to mens rea being referenced in that section because it has never referenced mens rea. So I think what Judge Piazza was getting at is that HANUSA could have been issued before the 1987 amendments. There's nothing that would have stopped the Court from saying it was simple, ordinary negligence. In other words, the 1987 amendment has no bearing on the language in 127.23A3ii nor the note in that section. And the reason is the note and that language are more specific than anything than is in the Clean Water Act Provision 1319 before or after the Clean Water Act amendments. And frankly, Your Honor ---- But then it reads B2 out. Why don't we need B2? Your Honor, I think ---- I mean, why doesn't it read B2 out under your interpretation? Respectfully, I don't think it reads B2 out because, again, and if you look at the response to the comments and the full explanation EPA gives, it's trying to figure out how to have these two provisions work in tandem, give meaning to every word, have the specific control of the general. B2 is by definition more general. It doesn't include the word negligence. Well, let me give you an example. There could be, if you look at the note in B2, so not the note in A3ii, but the note in B2. That note says that a state cannot require a mens rea for a civil violation. So that means that B2 is supposed to be addressing these general categories of what a state has to be able to enforce. They have to be able to, after certain types of criminal and civil violations. Some of those violations differ in terms of the general mens rea that applies. Negligence is different than willful or knowing. Civil doesn't have a mens rea. It's different than criminal. The point that ---- How does that solve anything to our problem? I mean, it doesn't move the ball to the argument on either side, it seems to me. Your Honor, I think it gives B2 meaning is what I'm trying to say. So B2 is a general provision to say a state has to have, and this goes back to Section 402B7, a state has to have adequate authority to abate permit and other violations in the Clean Water Act. And the way that EPA sort of begins that discussion generally is looking in 127.23B2 and saying, do you have the ability to enforce for negligent violations? Do you have the ability to enforce for willful, knowing violations? And the answer is yes. But what standard are you using? And under the federal standard, it can't be higher than simple negligence. And under Idaho, it's gross negligence. So do you agree that gross negligence is more than simple negligence? Absolutely, Your Honor. And so if I may, B2 establishes ---- Internal departmental documents that reconcile these sections. Your Honor, I don't believe it's come up before in any litigation that I'm aware of. I'd want to check with EPA counsel on that. I mean, the reason I ask for that is that we have the EPA marching down the road over here saying, well, we think there's a problem. And then they say it again, and there's a problem because negligence means simple negligence, and you have gross negligence. So march, march, and then boom. We get a final answer in response to a comment on the public proceedings that says, well, no, it's okay. So my question is, I mean, it doesn't seem like there's a deliberative process here, in which case we could say, well, EPA really considered the pros and cons in this. We have these other states. We're trying to figure out how to reconcile 50 state laws, which is not an easy thing to do. So that's why I'm asking whether there is anything else, and absent anything else, does the single changed response qualify as a considered judgment under our? There's a number of questions in there, Your Honor. There are. You can pick whichever one you want. I'll do my best to start, and you tell me where you need me to go once we get going here. So to start with, I would take this court back to the Defenders of Wildlife v. National Association of Home Builders case, which was a case under 1342. It was a state approval for the state of Arizona. And there's language in that case because the challenger in that case tried to say, well, EPA said something during the process of developing this approval that's different than what it said in the end. And because of the way these approval, these transfer proceedings work, what the court said there is, look, EPA can say something at the beginning of this process to try to figure out how to almost negotiate with the state about what the terms are going to be in a robust discussion. It doesn't have to be exactly the same as where it ends up at the end. It can change its mind in this proceeding. So to begin with, yes, EPA did on a number of issues, mainly the three that he has raised here, that ICL has raised here, and including on this regulation, it did sort of change the way it's approaching this. And that's fair enough. I mean, that happens in these state federal approval process. Absolutely. So then what you have is you have EPA trying to reconcile this. And if you look at the record, once EPA raises its concern with the state, the state comes back and says, well, we think you're reading 127A3ii out of the statute, and you're not giving enough weight to that language. And so EPA went back, as it should, as a federal agency, and took another look at the provision and tried to figure out how to make these two provisions work together and came up with an interpretation announced in its response to the comments. The approval was signed by the administrator. The proposal was put out by the regional administrator. There were a comment period. You've got response to comments. And so at this point, this is the reasoned, considered official word on this issue from EPA, issued by the agency itself in a formal document. And so to begin with, that's where, you know, I think if you're getting at the first criteria of Kaiser, our difference is the official agency position, I would say yes. This is not some sort of informal document. This is not a letter. This is not guidance. This is a response to comments regarding this approval. And getting back to and I. . . How is that established in the record? I'm sorry, what? How is that established in the record that was approved at the appropriate authority level? The approval itself in the Federal Register was signed by the administrator. The response to comments, I think, comes. . . I want to double check the record. Don't hold me to this, but I think the response to comments, it comes from EPA and is posted on the website around the same time. So it's sort of. . . It was approved at the appropriate authority to make it official. That's correct, Your Honor. Well, the approval is not so much as to the comment as to the final approval of the Idaho plan, correct? Yes, the approval of the Idaho, the IPDS, if you will, was signed by the administrator. So you've got the. . . So it meets the first factor. And going back to how we get to the three factors in Kaiser, what the Supreme Court is saying is, look, you've got. . . I think you're referring to Judge McEwen. You've got to try to use the traditional tools of statutory construction to figure out if you even need Kaiser deference. And so what EPA did here is it took a look at every word. It had the specific government general in these two provisions. It looked at the statutory or the regulatory history in which the note to A3ii was added and references to 1319 and B2 were removed. So it looked at all that. It looked at 1342B of the Clean Water Act, which only requires adequate authority to obey. It doesn't require the same standard exactly. And it said, okay, the way for us to give meaning to all these words and to try to resolve what appears to be ambiguity is to look at B2 as a general provision, the way I was discussing with you, Judge McEwen, and that the specifics laid out in A3ii have to govern. Okay, so it has done its job under the first part of Kaiser to say, can we figure this out? Is there a way to resolve this? What else does it apply to, B2? It would apply to any state approval application where a state is going to get enforcement authority for NPDES. It would require the state to have the same types of actions available to it. No, but, I mean, that's a bureaucratic answer. I'm sorry, but with respect, I'm trying to get like a practical answer. So it says it applies under A3. Does it apply, is it used in any other context? That is, B2 used in any other context other than A3? Well, Judge McEwen, I think to begin with, I don't think you can read B2 in a vacuum because it refers to A3. It says violations established under paragraph A3. Let's go back to my question. Maybe there's not an answer to it, but my question is, is there any other context in which B2 applies other than the language in A3? Let me see if I can help you answer that question. One of the problems using ellipses here, you leave out some information, but it appears clear to me that there's a three. Let's let him answer this. I want the EPA's position because EPA interpreted this. So let's hear what EPA says. Certainly, Your Honor. I think I understand the question better now. I appreciate the clarification. If a state applied for NPDES authority and submitted a package in which it did not establish that it has the ability to seek to enforce against negligent violations, regardless negligent criminal violations, civil violations, well, let's just leave it at negligent criminal violations, regardless of the mens rea, even if the mens rea and the state were generally ordinary negligence, if it did not establish that it was going to be able to enforce against negligent violations generally or willful knowing violations generally, then B-2 would apply because the state's application would be, by the general language in B-2, deficient. And so that's, I think, what it means. And to come back to the note in B-2, and I don't want to overemphasize this because I'm more interested in the note in A-3-double-I, but the note in B-2 makes clear how B-2 works a little bit. It's saying, look, you have to have these civil and criminal types of actions, and they have to be similar or similar or the same to the ones that EPA has in general. And here's an example of how this works. You can't have a requirement that for a civil violation somebody has to approve a mens rea. Civil violation is a violation, period, right? And so that's, I think, the clarity you're looking for. So that's how I see it as applying. Okay. Give me one second. I'm going to look at my EPA counsel and just make sure she agrees with me. Just because it's, I'm going well beyond what's in the briefs on that answer to some extent. So I want to be focusing on 2-little-I, right? That suggests to me there's at least one other I, maybe more. Do you know what 1-I is or if there's a 3-I? Because that would indicate what Paragraph B-2 is referring to in the general statement, Paragraph A-3. Sure, Your Honor. Do you mind if I grab it? Go ahead. Okay. Because I think people to this point have just used that one small section, 2-little-I. And I'll confess I've not read it. Okay. Okay. So I'm looking at 40 CFR 123.27a, which is titled, any state agency administering program shall have available the following remedies for violations of state program requirements. When I get to 3, it starts with to assess or sue to recover in court civil penalties and to seek criminal remedies including fines as follows. 1 refers to civil penalties. It says civil penalties shall be recoverable for the violation of any NPDES permit condition and goes on from there. 2 says criminal fines shall be recoverable against any person who willfully or negligently violates. And 3 also relates to criminal fines, but it's regarding knowingly false statements. So it could refer to Paragraph B-2 could refer to 1 and 3, but not 2 because of the note. I'm sorry. I'm not sure I understand the question. Are you saying that? The question was what does B-2 refer to when it says under Paragraph A-3 of the section? And we've been focusing on 2-I, but there are two other sections. So it seems to me the argument you made that it refers to 1-I and 3-I. I see my time is almost up. If I can answer the question. No, please, please answer. Your Honor, I want to make sure I'm understanding your question because I don't want to answer it in a way that I later think is incorrect. So if I could ask for some clarity, but let me tell you what I think you're asking me, and then you help me. So in B-2, you're saying that it says establishes violations under A-3, and I would say in general I think it's referring to all of A-3, the civil and criminal pieces. You're saying here you don't think that. That's fine. I agree with that. But there's an exception only with regard to one of the subsections, and that's A-3-2 or 2-Is. So are you saying, Your Honor, that the exception is the listing in the note of specific types of mens rea that are sufficient that might be different from EPAs? I'm just trying to determine what the reference to under paragraph A-3 refers to. I think it refers to all of A-3, and I would just say to the extent you're using the word exception, I would just say I think it's clearer. It's more specific. Is it significant that the note is under little 2, little 2-I? Does that have any significance? It is to me. I think that that means it applies to little 2-I. I think that's correct, Your Honor. And does gross negligence figure in at all now in the federal enforcement system? Not under Section 1319, Your Honor. Anywhere else? And that's the misdemeanor. I believe that's correct. There are other places. I believe there are other places in the Clean Water Act where the phrase gross negligence is used, but it's not in that section. But not in this context. Not in this exact context, no. Thank you. Your Honors, I see that I'm over time. Thank you. For these reasons and the reasons in our brief, which we didn't discuss, we ask that you deny the petition. You have a little bit of time for rebuttal. Thank you, Your Honor. Just real briefly on the EPA's changing position, the federal register notice which approved the Idaho NPDES permit program was issued by EPA and I believe signed by the administrator, but it makes no mention of the mens rea standard. If you look at ER 73 and ER 75, those are the approval letters. Those are the letters from the regional administrator of EPA to Idaho in 2016 saying, you have mens rea problems. And then the second letter, ER 75, is from the division director of the Region 10 Water Division. So these are not low-level email correspondence going back. These are official positions by EPA to the State of Idaho. That wasn't the final position. I'm sorry? It was not the final position. No, the final position obviously was that it was in response to comments. I mean, they were saying we have a problem, but they didn't take a final position until the end, correct? That's correct, Your Honor. The final position is in the response to comments. And I see I have 16 seconds left. Use it however you want. Thank you, Your Honor. With that, I will just rest on our briefs. Thank you. Thank you both for the argument and the briefing. The case just argued, Idaho Conservation League v. EPA, is submitted and we're adjourned for the morning.
judges: McKeown, Paez, Huck